IN THE UNITED DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION
---o0o---

VISTO CORPORATION,
Plaintiff,
vs. No. 2-05-CV-546-DJF
MICROSOFT CORPORATION,
Defendants.

---

DEPOSITION OF DANIEL MENDEZ
Palo Alto, California
Tuesday, March 27, 2007

REPORTED BY:
LYNNE LEDANOIS
CSR No. 6811
Job No. 73677

41c36845-18bc-4a07-b6e8-17e571280bbf



Page 2
Daniel Mendez Confidential Attorneys Eyes Only March 27, 2007

IN THE UNITED DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION
---o0o---

VISTO CORPORATION,
Plaintiff,
vs. No. 2-05-CV-546-DJF
MICROSOFT CORPORATION,
Defendants.

---

Deposition of DANIEL MENDEZ, taken on behalf of Defendant, at 201 Redwood Shores Parkway, Suite 500, Redwood Shores, California, beginning at 9:41 a.m., and ending at 6:54 p.m. on Tuesday, March 27, 2007, before LYNNE LEDANOIS, CSR 6811.

713.524.4600
3401 Louisiana Suite 300
Esquire Deposition Services
Houston T.X.
713.524.4951
1.800.767.9532

41c36845-18bc-4a07-b6e8-17e571280bbf

APPEARANCE OF COUNSEL:

For Plaintiff:

MANATT, PHELPS & PHILLIPS
BY: SHAWN G. HANSEN
Attorney at Law
1001 Page Mill Road, Building 2
Palo Alto, California 94304
650.812.1367
shansen@manatt.com

For Defendant:

WEIL, GOTSHAL & MANGES
BY: GARLAND STEPHENS
BY: DEREK BRICE
Attorneys at Law
700 Louisiana, Suite 1600
Houston, Texas 77002
713.546.5071
garland.stephens@weil.com

ALSO PRESENT: MIKE ZELINA

VIDEOGRAPHER:

ESQUIRE DEPOSITION SERVICES
BY: MARTY MAJDOUB

41c36845-18bc-4a07-b6e8-17e571280bbf

system that we resolve the -- the problem of having this access to the data outside the firewall, but also of the synchronization of it so that the two workspaces that you had would be maintained in the same coherent fashion. Does that make sense? It's --

Q I think so, but let's try to work through it in a little more detail.

A Yes.

Q When you talk about "workspaces," what are you referring to?

A The data that you have in a -- in a particular -- your -- your particular data that belongs to you or that you're working with.

Q Like e-mail?

A E-mail, your -- your pin data, your calendar, your contacts, but also even beyond that, I mean, you know, the -- all data in reality.

One of the things that we realized is the fact that once we had built this infrastructure and -- and this conduit, basically, for exchanging and synchronizing information that the type of the data really becomes irrelevant in a way. I mean, e-mail is a very important type of data, but there are other data and -- and the techniques we were using could be applied to any data, not only e-mail and pinned data, but CRM or

the Internet, yes.

Q Okay. And -- and they would -- some of those would support the POP3 protocol; right?

A Yes.

Q And POP3 stands for Post Office Protocol 3; is that right?

A Yes.

Q And there were also clients that supported IMAP4 before you came up with your invention; is that right?

A I don't remember the -- I do remember POP3, I don't -- I'm not quite sure when -- when the -- the IMAP dates are.

Q You're aware -- what is IMAP4?

A It's another protocol for e-mail access, kind of like a successor for POP3.

Q And it has -- it has more functionality than POP3; right?

A Yes.

Q That protocol was published as a Internet engineering task force RFC before you came up with your invention; right?

A I don't know.

Q You don't know?

A No.

Q Okay. Do you have any reason to doubt that IMAP4 was available to the public before you came up with your invention?

MR. BECKER: Object to form.

THE WITNESS: I don't know one way or the other.

BY MR. STEPHENS:

Q Okay. You could use POP3 through a firewall, right, before you came up with your invention?

A If you were outside the firewall and the server was inside the firewall?

Q Yes.

A Only if -- if a firewall was configured to allow that type of interaction, which I believe very, very few, if any, were.

Q What is your basis for that belief?

A Just my experience in the industry. I never did do a survey or anything like that.

Q What experience in the industry did you have beyond your own personal use of the corporate VPN for the company you were working for?

A Just experience of being in the industry.

Q What -- I guess I'm trying to probe that a little further.

A Sure.

A On the reexam certificate?

Q Yes.

A Yes.

Q What does it mean to generate first examination results from first version information which indicates whether a first workspace element has been modified?

MR. BECKER: Object to form.

And also caution you not to divulge the contents of any attorney-client communications on that subject.

THE WITNESS: Well, with the same caveat that this -- the claims have legal language and all that, I mean, I think to me what it says is to figure out whether something has changed.

BY MR. STEPHENS:

Q Is it possible to do synchronization without generating examination results from version information which indicates whether a workspace element has been modified?

MR. BECKER: Object to form. Excuse me.

BY MR. STEPHENS:

Q And let me be clear, I'm talking about synchronizing workspace information, I don't mean just synchronizing your watch, for example.

A Okay. I think you do need to know what has

:09:22 changed.

:09:25 Q So is it your view, then, that it's not possible to synchronize a workspace information without generating examination results from version information which indicates whether a workspace element has been modified?

:09:45 A Okay. So to synchronize you need to know what has changed. I read this and it does suggest to me figuring out what has changed. Insofar as those are like that, and those interpretations are accurate, I do believe that you need to know what has changed in order to synchronize.

:10:05 Q So under that view, anything that synchronizes workspace data would have to generate examination results from first version information which indicates whether a workspace element has been modified; right?

:10:18 MR. BECKER: Object, form.

:10:47 THE WITNESS: If I understand your question correctly, you're asking me whether if you do not perform this step B, can you synchronize without it?

:10:55 BY MR. STEPHENS:

:10:55 Q Yes.

:11:03 A Well, you need to know what has changed -- I go back to that statement -- in order to be able to synchronize. And -- but I'm reluctant to equate knowing

what has changed exclusively with the wording that is in this particular claim.

Q Well, what is it about the wording of the claim that leads you to have that reluctance?

A That it is a -- I know that these claims are legal statements that have words with very precise meaning construed by courts, and I am reluctant to equate those without knowing the exact construction of each of these terms and how they are interpreted by others.

Q Well, would it help you if I read to you whatever interpretations the court has given to those terms? What I'm really after here is your understanding as the inventor of whether or not the things that are recited in this description of one of your inventions are required to do synchronization or whether there's other ways to do synchronization of workspace data.

MR. BECKER: Object to form.

THE WITNESS: Okay. Let me try to give and answer that I think -- I do believe that to perform synchronization, you need to know what has changed. That -- that is an element of that process. I do believe that what it's talking about in here is a methodology for figuring out what has changed.

I cannot say whether it is the only methodology

BY MR. STEPHENS:

Q Okay. And that's -- that's how it -- how it works in payload push; right?

A Well, I mean -- so stepping away from this language, I'll say in the payload push, we -- we look at it and we have the delta and we send it out.

Q Okay. And that's -- that sending the delta, the results of the examination through the firewall is what is the initiating step; right?

MR. BECKER: Object to form.

BY MR. STEPHENS:

Q Of step D?

A That's the sending it out, yes.

MR. STEPHENS: Okay. We need to take a break, so we can change the tape.

THE WITNESS: Okay.

VIDEOGRAPHER: This is the end of Videotape Number 3. We are now going off the video record. The time is 5:24 p.m.

(Recess Taken.)

VIDEOGRAPHER: This is the beginning of Videotape Number 4. We are now back on the video record. The time is 5:41 p.m.

BY MR. STEPHENS:

Q Mr. Mendez, we've talked quite a bit today

41c36845-18bc-4a07-b6e8-17e571280bbf

about different e-mail protocols, SMTP, POP3, IMAP4, and MAPI, VIM; right?

A Yes.

Q Those are all different ways of transmitting e-mail; is that right?

A Well, they can all be used to exchange e-mail information, yes.

Q And they all store -- I should not put it that way -- they all represent e-mail in different formats; right?

MR. BECKER: Object, vague -- excuse me, form.

THE WITNESS: They all represent e-mail in different forms; again, internal representation of e-mail being different, I don't know.

BY MR. STEPHENS:

Q So I mean, SMTP represents an e-mail, the same e-mail, in fact, in a different way, in a different form, than POP3 does; right?

A When it's stored -- so SMTP, right, it transports the e-mail, and POP3 actually does have the storage of the e-mail pending at the post office. So they are serving different functions.

You know, all these things, like you mention, MAPI as well an VIM, and those are more APIs to interact with -- with data stores that may include storage of